### NUTT v STATE ex FULTON

Ohio Appeals, 8th Dist, Cuyahoga Co

No 14784. Decided April 23, 1936

Boyd, Brooks & Wickham, Cleveland, for plaintiff in error.

John W. Bricker, Attorney General, Columbus, and Day & Day, Cleveland, special counsel, for defendant in error.

ROSS, PJ, MATTHEWS and HAMILTON, JJ, (1st Dist) sitting by designation.

### OPINION

By HAMILTON, J.

This law suit was commenced in the Court of Common Pleas of Cuyahoga County, Ohio, by the Superintendent of Banks of the State of Ohio in charge of the liquidation of the Union Trust Company of Cleveland, Ohio, against Joseph R. Nutt, as defendant to recover for the loss and damages claimed to have been sustained by the bank, due an alleged unlawful and improper loan of money made by the Bank to Joseph P. Harris, a Vice President of the Bank.

The plaintiff predicates his right to recover judgment from the defendant on three grounds:

First: The loan was made indirectly to the defendant, then an officer of the Bank in violation of §710-115, GC.

Second: That the loan was made directly to Harris, an officer of the Bank, in violation of §710-115, GC.

Third: The defendant at the time the loan was made was an officer of and stood in a trust relation to the Bank; that he had a pecuniary interest in the loan, and, notwithstanding that fact, he sponsored the loan, and procured and interested the Bank in making the loan to Harris without disclosing to the Bank his interest therein, thereby violating his duty to the Bank, and so rendered himself liable to the Bank for the loss sustained by it by reason of the loan.

The case was tried to the court and determined by it as a case in equity.

The trial court, on consideration of the case, found the defendant guilty of an actionable breach of duty resulting in the loss claimed by the bank and rendered judgment against him, in the sum of $165,065.61. The case is here on error to that judgment.

The errors complained of are that the judgment is against the manifest weight of the evidence as to the statutory liability, and as to his violation of duty to the bank in his trust capacity as an officer thereof. It is further claimed that the amount of the judgment is contrary to law. This last claim is based upon the equities concerning the value of the stock, and a claimed sale thereof by the plaintiff superintendent.

We will first consider the question of the statutory liability. The sections of the statute involved are §§710-115 and 710-67, GC. They provide:

"Sec 710-115 GC. No loan shall be made, directly or indirectly to any officer, director or member of the executive committee of any bank unless duly authorized or approved by the directors. Such authorization or approval shall be recorded in the records of their proceedings, and all loans when so authorized and made to officers, directors or members of the executive committee shall be made and secured in the same manner as loans to other persons."

"Sec 710-67 GC. Any director of a bank who shall knowingly violate, or who shall knowingly permit any of the officers, agents or employees of a bank to violate any of the provisions of this act shall be held liable in his personal and individual capacity for all damages which the bank, its stockholders, or any other person shall have sustained in consequence of such violation."

The facts concerning the loan to Harris are as follows:

Nutt and Harris were friends of long standing and were both officers of the Bank; Harris being a Vice-President, and Nutt a Director, and members of the Executive Committee of the Bank. Harris dealt largely in stocks and securities. In order for Harris to put through a deal, he borrowed some stocks belonging to Nutt, among them being a block of 1500 shares of stock of F. E. Myers and Bro. Co. Harris in his transaction became indebted to Hornblower and Weeks in the sum of $264,344.52 upon a brokerage account secured by collateral, a part of such collateral being the 1500 shares of F. E. Myers and Bro. Co. stock, which, he stated, belonged to the defendant Nutt; that the brokers made demand upon Harris for additional collateral or a substantial payment in reduction of the debt owing by him to it. Failure to comply, of course, meant the liquidation and sale of the collateral. This fact being made known in some manner to Nutt through some conversation between Harris and Nutt, it was suggested that the Bank in question furnish the loan to Harris in order to liquidate the Hornblower and Weeks account. Just who made the suggestion concerning the loan is in dispute. Thereupon, Nutt talked with the President of the Bank, Mr. Baldwin, regarding the loan to Harris and submitted the list of securities as collateral to the loan. Baldwin, the President, suggested that he did not believe the collateral sufficient, whereupon Nutt proposed he would put up 500 more shares of the F. E. Myers and Bro. Co. stock, which the President considered sufficient collateral, as at the time the market value of the collateral stock was in excess of the amount of the loan.

On December 19, 1930, Nutt presented the matter of the loan to Harris to the Finance Committee of the Bank, which agreed to make the loan. This is shown by the minutes of the meeting of the Finance Committee under date of December 19th, 1930, which state: "It was agreed to loan J. P. Harris $263,000.00 secured by collateral." The evidence is that the collateral was laid before the Finance Committee.

The minutes of the meeting of the Executive Committee held on Monday, December 22, 1930, show: "Minutes of the meetings of the Finance Committee held from December 16, 1930, to December 20, 1930, inclusive, were read, and upon motion duly made, seconded and unanimously carried were approved and confirmed."

The minutes of the Finance Committee held on Tuesday, December 23, 1930 approved "loans made at the main office under date of December 22, 1930, as described below" * * * "Collateral loans Nos 80553 to 80635, $1,643,036.49." The loan in question was a part of this approved.

At a meeting of the Board of Directors held on January 13, 1931, the President made his report concerning the Bank loans, and his report was approved.

At a meeting of the Board of Directors held on Tuesday, December 23, 1930, at which 39 out of the 60 Directors were present, the Chairman stated "there had been placed on the table the original journal sheets showing all the commercial, collateral and real estate loans and bills of exchange taken by the main office of this company from July 1, 1930 to December 20, 1930, inclusive, and that the same were submitted for inspection to any of the directors who might wish to inform themselves regarding said transactions."

At the time the question of the loan was submitted to the Finance Committee, the list of securities as collateral to the loan of $263,000.00, according to the estimate placed thereon, were of the value of $304,-850.00.

It is claimed that at the time Harris was financially weak, approaching bankruptcy, which was unknown to the other Directors, but of which it is claimed Nutt had knowledge. Some of the witnesses estimated the margin as not being sufficient for such a loan; others were of the opinion that the loan was amply secured.

These facts bearing on the statutory liability under §§710-115 and 710-67, GC, do not show a violation of the law by Nutt which would make him liable in a personal individual capacity for the damage or loss sustained by the bank if any.

It is claimed the loan was consummated before it was approved by the Executive Committee and that the approval by the executive committee was perfunctory. The law does not fix the liability on the approval of the Board of Directors before the loan is executed, if that was done in this case.

The language of the statute is, "unless duly authorized or approved by the directors." This language is clear and understandable, and must be read in its ordinary meaning. The loan must be authorized by the Directors, and if the loan has been made, in order for it to stand as a proper loan, it must be approved by the directors. Such authorization or approval shall be recorded in the record of their proceedings. This was done. The loan was approved by the directors, and it was authorized by the executive committee. The requirements of the statute were fully carried out. If the directors acted without sufficient knowledge or care, that would be their liability and not Nutt's, if he was responsible for the loan primarily.

It is claimed that the loan was indirectly to Nutt. The evidence does not sustain that contention. True, Nutt loaned his stock to Harris originally, and he did make Harris an additional loan of Myers stock when Harris was compelled to secure the loan from the Bank to discharge the indebtedness to Hornblower and Weeks. If, as is claimed Nutt knew that Harris was about to the end of his string, why should he add 500 shares more of his stock to assist his friend in his financial difficulty. It is claimed he was doing this to preserve and save the 1500 shares already loaned to Harris. But if these shares were gone by reason of Harris' financial condition, how could Nutt hope to have those shares by putting 500 more shares in jeopardy, if he knew they would be lost.

We are, therefore, unable to see how there was any loan directly or indirectly to Nutt, and the provisions of the statute having been complied with in making a loan to an officer, we see no statutory liability for the loss. He had no pecuniary interest in the loan. He was not a partner, and there is no evidence tending to show he was a partner or was to share in any gain.

Many cases are cited by counsel in the briefs, but as in most cases of this kind, those discussions are all based upon a different state of facts, and some of them under different provisions of the statutory law. So that this case must be considered on its own facts and law, and the conclusions arrived at must be reached by a consideration of the fundamental principles of the law applicable.

The trial court found no violation of the statute which would create a personal liability, and in that conclusion it was correct.

This brings us to the equity side of the case.

The whole case and the liability under the statutes is considered by the court sitting in chancery by agreement and consent or acquiescence of counsel for both parties.

The equity question is, whether or not Nutt violated his fiduciary obligation to the bank and its depositors in procuring the loan for Harris. There are some facts in the case which would tend to show that Nutt did not fully disclose all the facts and circumstances relating to the loan and its soundness, as his duty required under the circumstances. Whether this should be considered as culpable negligence or a violation of the maxim uberrima fides is of grave doubt. Most of the facts and circumstances concerning this ██ question are inferential only and really involve afterthought rather than forethought. It would serve no good purpose to go into these questions of fact and discuss them pro and con, as they are discussed in the briefs, but we will content ourselves with the proposition that we are of opinion that the judgment as to a violation of the trust imposed in Nutt does not go to the extent of holding him personally liable for the loss, if any, under the claimed breach of trust, and we find the judgment is manifestly against the weight of the evidence as to the breach of trust.

We come now to what we consider the decisive question, which in itself requires a reversal of the case, and this concerns the amount of the loss and the method of computing the judgment by the trial court.

It will be remembered that Harris' note was for $263,000.00, and was secured by the several items of stock, among which were the 2000 shares of stock loaned to Harris by Nutt, and the note not having been paid or any part thereof by Harris, the liquidator of the Bank put up the stock, including the Myers stock for sale on January 5, 1934, and there being no bidders, the liquidator himself bid in the stock for $110,270.00. This price, minus the expense of the sale, was credited on the Harris note, leaving a balance unpaid thereon including interest of $165,065.81.

It developed at the trial that the liquidator had resold some of the stock which he had bought in at the public sale, at a profit of $4,700, and still retained the remainder of the stock, the principal item of which was 6200 shares of Myers and Bros. Co. stock, which had at the time of the trial a market value of nearly $200,000.00.

The liquidator claimed to be entitled as his damage the difference in the amount of the note and the price at which he bid in the securities, and the trial court upheld him in this claim. The trial court must have conceived the idea that the sale was like unto a sale of property to foreclose the equity of redemption in property held as security, and cites authorities to that effect. The principal case cited by the court, and on which he relied, is Moorman v Hudson, 125 Ind., 504, (25 NE 593) where land was sold upon foreclosure to satisfy a mortgage lien, and was bought in by the mortgagee for a sum much less than the face of the mortgage. The land was worth more than three times what he paid for it at the time of the sale. The judgment remaining unsatisfied of record, both co-sureties, relying upon the discrepancy between the value of the property obtained by the creditor and what he had paid for it, sought a decree in equity to declare the judgment fully paid and satisfied. The Supreme Court of Indiana found against them, and held the amount realized at the sale was conclusive as to the value of the land as between the creditor and both sureties of the debtor. The instant case is not that kind of a case. This rule might be applicable if it were invoked as against Harris, the debtor. The plaintiff in this case has already secured a judgment for the full amount of the note against Harris. True, plaintiff had the right to sell the stock in order to liquidate the bank. The liquidator was not appointed for the purpose of dealing in its collateral. We are now in equity, in which it is sought to hold an officer, director, for a loss, not a liability on the note, not a liability for the debt, but for the loss sustained by breach of trust on the part of the director of the bank. We have here the situation of the bank or the liquidator having a judgment against Harris for the full amount of the unpaid balance, after crediting the amount on the sale of the stock. What there was to credit on the note by the liquidator we cannot see. He received no cash. He paid no cash. He held a perfunctory sale to himself of the stock, which is now available to save the Bank from loss growing out of the improvident loan, if such it was. His right to bid in the stock was challenged, but a liberal construction of the statute would probably give him that right in order to protect the assets.

But in equity could the liquidator cause a situation which would create an ostensible loss in a trust res, and thereby have an action in equity against the trustee for

a violation of the trust, under the claimed loss created only by his own act?

For the purpose of liquidation, the sale was no sale. Whether or not a court order was necessary, we are not deciding. After the sale, the liquidator has possession of all the stock, just as he did before the sale. The purpose of the stock was to liquidate the debt, and not for speculative purposes. Had the stock passed out of his control, undoubtedly the amount of the loss would have been fixed. It is admitted the stock is yet available for the purpose for which it was pledged and is in the hands of the liquidator available for the purpose of minimizing any loss, or fully liquidating the Harris debt.

Under these facts, how could a court of equity decree a breach of trust for a loss which did not exist?

It is argued that had the stock gone down in value after the sale, the bank would have had to suffer. Again, counsel argues in a circle. They argue that the stock having advanced in price, it was the Bank's gain. If the stock had gone down, it would have been none the less a loss to the bank growing out of the transaction, and Nutt could have been held for whatever that loss was. Whether it arose directly or indirectly, it would have been none the less a loss to the Bank, and had the stock gone down in value, that would have been considered in ascertaining the loss to the bank, and likewise, as before suggested, the stock rising in value must be considered in computing the amount of the loss to the Bank, and before the liquidator could recover a judgment for a loss, that loss must be shown and it cannot be ascertained until the liquidator disposes of the stock in such a way that it is no longer available for the purpose for which it was pledged, to-wit: the discharge of the Harris debt; or, if not considered as a discharge of the Harris debt, certainly it may be considered in ascertaining any loss to the bank growing out of the Harris transaction.

Our conclusion is that the action has been prematurely filed, for until the liquidator disposes of the securities in a lawful manner, in a way that they are no longer available for the purpose for which they were pledged, no cause of action has arisen. This, in our opinion, is the judgment that the trial court should have entered.

The judgment of the Court of Common Pleas is reversed, first, for the reason that no statutory provision was violated in the making of the loan by Nutt: second, that the decree holding a breach of trust on the part of Nutt as causing the loss to the Bank, is manifestly against the weight of the evidence; and, third, that there is no proper basis for ascertaining the damage or loss, upon which could be predicated a cause of action at the time this action was filed.

The trial court should have dismissed the petition, for the reason that no cause of action had accrued at the time the petition was filed, as there was no ascertainable basis for fixing the damage or loss.

Coming now to enter the judgment that the court below should have entered, the petition will be dismissed, without prejudice, as presenting no cause of action at the time of the filing of same.

ROSS, PJ, and MATTHEWS, J, concur.